## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JORGE L. SANTANA CASTRO and RAMON PEÑA LOZADA, Individually and On Behalf of All Others Similarly Situated, | Civil No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| ACEROS DE AMERICA, INC.; CAROLINA BUILDING MATERIALS, INC.; CAROLINA BUILDING LLC; STEEL SERVICES & SUPPLIES, INC.; THYSSENKRUPP AG, THYSSENKRUPP MANNEX GMBH A/K/A THYSSENKRUPP MATERIALS TRADING GMBH, THYSSENKRUPP MATERIALS N.A., INC.; JUAN C. APONTE-TOLENTINO; EDGARDO SOLA-COLON; FRANCIS GARCIA-HAGHVERDIAN; NORBERT GOERTZ, RALF GENDRUSCHKE; CO-CONSPIRATORS A through Z, | |
| Defendants. | |

### CLASS ACTION COMPLAINT

TO THE HONORABLE COURT:

Plaintiffs Jorge L. Santana Castro and Ramon Peña Lozada on behalf of themselves and all others similarly situated, bring this Class Action Complaint for damages and injunctive relief against named Defendants Aceros de America, Inc. ("Aceros"); Carolina Building Materials, Inc. ("CBM"); Carolina Building LLC ("CB"); Steel Services & Supplies, Inc. ("SSS"); ThyssenKrupp AG; ThyssenKrupp Mannex GmbH a/k/a ThyssenKrupp Materials Trading GmbH; ThyssenKrupp Materials N.A., Inc.; Juan C. Aponte-Tolentino; Edgardo Sola-Colon; Francis Garcia-Haghverdian; Norbert Goertz, Ralf Gendruschke; and Co-Conspirators A through Z for violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and various Puerto Rico antitrust and consumer

protection laws. Plaintiffs allege for themselves as to their own acts and for all others upon investigation of their counsel.

## I.    **INTRODUCTION**

1.      This action arises from a *per se* unlawful agreement between Defendants—various suppliers of steel reinforcing bars ("rebar")—to artificially increase and fix the prices of rebar sold in the Puerto Rico. Defendants fixed prices and allocated markets, leading to the unlawful increase in the price of rebar in Puerto Rico.

2.      This conspiracy occurred between 2015 and at least 2022, with anticompetitive effects continuing to the present, during which time Defendants, acting in concert, fixed, raised, maintained, and stabilized prices for rebar sold to customers, including contractors and individuals in Puerto Rico and beyond. This conduct resulted in inflated prices, restricted competition, harmed consumers, and created an artificial pricing structure which increased the cost of reconstruction efforts after Hurricane María.

3.      A large portion of US imports for Rebar come from just a few countries including Turkey, Spain, Mexico, and the Dominican Republic.  Puerto Rico is a large importer of Rebar from these countries. Indeed, in September 2020, for example, San Juan, Puerto Rico was the second largest importer district for Rebar in the United States with more than 11,300 tons of Rebar imported that month.

4.      Rebar is routinely sold at the wholesale level by the quintal. A quintal is 100kgs or approximately 220lbs. From 2015 to 2022, the price of Rebar more than doubled as a result of Defendants' price-fixing conspiracy, increasing from $25.50 per quintal to $54.00 per quintal.

5.     Defendants Aceros, CBM, CB, and SSS are Puerto Rico-based, wholesale and retail steel distributors. Collectively these Defendants control over 70% of the Rebar market in Puerto Rico.

6.     Over an eight-year period, from 2015 through 2022, including critical reconstruction periods in Puerto Rico following Hurricanes Irma and Maria in 2017, Defendants explicitly conspired to fix, raise, maintain, and stabilize prices rebar, that were sold to hardware stores, contractors, construction companies, and others in Puerto Rico and elsewhere. Defendants also artificially reduced output of rebar by creating shortages and coordinating reduced shipments of Rebar to Puerto Rico, creating cover for price increases. This maximized Defendants' profits at the expense of Puerto Rican purchasers of Rebar.

7.     Plaintiffs seek to represent a Class of individuals that purchased rebar indirectly from Defendants at supracompetitive prices to recover treble damages, injunctive relief, and other relief as is appropriate, based on Defendants violation of state and federal antitrust laws. Plaintiffs demand a trial by jury.

## II.     JURISDICTION AND VENUE

8.     The Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 1367. The Court has jurisdiction over Plaintiff's claim for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

9.     This Court has personal jurisdiction over Defendants because they purposefully directed its business activity toward this jurisdiction and had substantial contacts with this jurisdiction, and because Plaintiffs' claims for relief arise from and relate to illegal acts committed by Defendants within this jurisdiction. Plaintiffs paid unlawful overcharges for rebar and suffered antitrust injury within this jurisdiction.

10.     Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22. During the Class Period (defined below), Defendants transacted business in this District, and a substantial portion of the activity at issue in this case occurred in this District

### III.     PARTIES

#### A.  PLAINTIFFS

11.     Plaintiff Jorge L. Santana Castro is a citizen of Puerto Rico.  Plaintiff Santana purchased rebar within Puerto Rico indirectly through a retailer during the Class Period defined herein.

12.     Plaintiff Ramon Peña Lozada is a citizen of Puerto Rico.  Plaintiff Peña purchased rebar within Puerto Rico indirectly through a retailer during the Class Period defined herein.

#### B.  DEFENDANTS

##### a.  Aceros

13.     Defendant Aceros de America, Inc. is a Puerto Rican for-profit corporation with its principal place of business at Road #1, KM 25.0, San Juan, PR, 00726. Aceros is engaged in "the retail and wholesale distribution of construction and hardware supplies in Puerto Rico and also exports its merchandise to other Caribbean islands."4 Aceros is 50% owned by ThyssenKrupp AG.

14.     Defendant Juan C. Aponte-Tolentino ("Aponte"), a resident of Puerto Rico, was at all relevant times Vice-President and Interim President of Aceros, who conspired and colluded with the Defendants to fix, raise, maintain, and stabilize prices for Rebar, as well as allocate market and customers, in Puerto Rico and elsewhere.

##### b.  Carolina Companies

15.     Defendant Carolina Building Materials, Inc. is a Puerto Rican for-profit corporation with its principal place of business at Road 860, Km 1, Bo Martin Gonzalez, Carolina, Puerto Rico,

00984. CBM is in the business of the "retail sale of construction materials and related accessories" including Rebar in Puerto Rico.7 CBM at all relevant times was a wholly- owned subsidiary of Defendant, ThyssenKrupp Materials Trading GmbH.

16.    Defendant Carolina Building LLC ("CB") is a Puerto Rican limited liability company with its principal place of business in Rd. 860 Km 1, Bo Martin Gonzalez, Carolina, Puerto Rico, 00984. CB is in the business of importation, distribution and sale of Rebar used in construction in Puerto Rico.

17.    Defendant Edgardo Sola-Colon ("Sola-Colon"), a resident of Puerto Rico, was the president of CBM at all relevant times.9 Sola-Colon was president and partial owner CB during the relevant period. Sola-Colon conspired and colluded with other Defendants to fix, raise, maintain, and stabilize prices for Rebar, as well as allocate market and customers, in Puerto Rico and elsewhere.

### c. Steel Services

18.    Defendant Steel Services & Supplies, Inc. is a Puerto Rican for-profit corporation with its principal place of business at 109 Road 865, Campanilla, Toa Baja, Puerto Rico, 00949. SSS is "principally engaged in the import, fabrication and wholesale of steel rebars, structural steel, ornamental iron products and related metal products as well as construction materials and contractors' equipment and supplies."

19.    Defendant Francis Garcia-Haghverdian ("Garcia") is the current President of SSS.11

20.     Garcia served as Treasurer of SSS in 2021, becoming President of SSS in 2022. Garcia conspired and colluded with Defendants to fix, raise, maintain, and stabilize prices for Rebar, as well as allocate market and customers, in Puerto Rico and elsewhere.

### d. ThyssenKrupp

21.    Defendant ThyssenKrupp AG is a multinational conglomerate headquartered in Essen, Germany. ThyssenKrupp AG is one of the world's largest steel producers generating an annual revenue of around $40 billion, with extensive operations across 48 countries, and employing around 100,000 people worldwide in industrial engineering, materials trading, and steel production.13 ThyssenKrupp AG controls a vast network of subsidiaries and affiliates across the globe, including its wholly-owned subsidiary Defendant ThyssenKrupp Materials Trading GmbH and its 50% ownership in Aceros.

22.    Defendant ThyssenKrupp Materials Trading GmbH is a wholly-owned subsidiary of ThyssenKrupp AG, and itself is engaged in the sale of steel products and other industrial materials. ThyssenKrupp Materials Trading GmbH also wholly owns, as a subsidiary, Defendant CBM. Through its ownership and control of CBM, and CBM's illegal collusion with Aceros and SSS, ThyssenKrupp Materials Trading GmbH exercised a dominant position in the market for rebar in Puerto Rico and elsewhere.

23.    Defendant ThyssenKrupp Materials N.A., Inc. a/k/a and d/b/a ThyssenKrupp Materials North America is the North American division of ThyssenKrupp AG focused on providing construction and manufacturing products across various industries. ThyssenKrupp Materials N.A., Inc. provides a wide array of products including rebar.

24.    Defendant Norbert Goertz ("Goertz") is an individual residing in Michigan and is the CEO of ThyssenKrupp Materials N.A., Inc.14 Goertz is also a director of Defendant Aceros and a director at Defendant CBM.16 Goertz also conspired and colluded with Defendants to fix, raise, maintain, and stabilize prices for Rebar, as well as allocate market and customers, in Puerto Rico and elsewhere.

25.     Defendant Ralf Gendruschke ("Gendruschke"), is an individual residing in Michigan and the Vice President of Controlling at ThyssenKrupp Materials N.A., Inc. Gendruschke is also a director of Defendant Aceros and a director at Defendant CBM. Gendruschke conspired and colluded with Defendants to fix, raise, maintain, and stabilize prices for rebar, as well as allocate market and customers, in Puerto Rico and elsewhere.

**e.  Co-Conspirators A-Z**

26.     Co-Conspirators A-Z are other individuals or entities who engaged in or abetted the unlawful conduct by Defendants set forth in this Complaint. Plaintiffs may amend this Complaint to allege the names of additional Defendants as they are discovered

**IV.     AGENTS AND CO-CONSPIRATORS**

27.     The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

28.     Each corporate Defendant's agents operated under the authority and apparent authority of its respective principals.

29.     Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

30.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

31.     Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

32.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. Furthermore, to the extent that subsidiaries within corporate families distributed the rebar products discussed in this Complaint, these subsidiaries played a significant role in the conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut their pricing agreements. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to maintain supracompetitive prices.

## V.    CLASS ACTION ALLEGATIONS

33.     Plaintiffs bring this action for damages and injunctive relief on behalf of themselves and a class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), with the class initially defined to include:

> All persons and entities who indirectly purchased in the United States, from any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, rebar from January 1, 2015 through the present (the "Class Period") for their own personal use or as a component of a cement or concrete structure (the "Nationwide Injunctive Relief Class");

34.     Additionally, Plaintiffs bring this action on behalf of the following subclasses:

> All persons and entities who indirectly purchased in the Commonwealth of Puerto Rico, from any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, rebar from January 1, 2015 through the present (the "Class Period") for their own personal use or as a component of a cement or concrete structure (the "Puerto Rico Subclass")

35.     The Class and the Subclass may collectively be referred to as the "Class" or the "Classes."

36.     The class definition specifically excludes the following persons or entities: (a) any of the Defendants named herein; (b) any of the corporate Defendants' parent companies,

subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) all governmental entities; and (e) the judges and chambers staff in this case, as well as any members of their immediate families; and (f) all jurors assigned to this case.

37.    Plaintiffs do not know the exact number of Class members, but due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed throughout the Puerto Rico and the United States including in every state that permits an indirect purchaser to assert a claim for damages, such that joinder of all Class members in the prosecution of this action is impracticable.

38.    Plaintiffs' claims are typical of the claims of their fellow Class members because Plaintiffs purchased rebar during the Class Period indirectly from Defendants. Plaintiffs and all Class members were damaged in the same manner by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

39.    Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct

- Whether Defendants contracted, combined or conspired with one another to fix the prices of rebar at any time during the Class Period;

- Whether Defendants contracted, combined or conspired with one another to restrain trade of rebar at any time during the Class Period;

- Whether Defendants' conduct caused the prices of rebar sold directly to wholesalers, retailers, and consumers to be higher than the competitive level as a result of their restraint of trade;

- Whether Plaintiffs and the other members of the Class were injured by

Defendants' conduct and, if so, the determination of the appropriate Class- wide measure of damages; and

- Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief

40.     These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

41.     Plaintiffs will fairly and adequately represent the interests of the Class because they purchased rebar directly from Defendants within the United States and Puerto Rico during the Class Period and have no conflicts with any other members of the Class. Furthermore, Plaintiffs have retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation

42.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

43.     This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

44.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.    FACTUAL ALLEGATIONS

45.     Through an intertwined network of companies, subsidiaries, executives, and directors, Defendants were able to coordinate a horizontal price-fixing conspiracy among

would-be competitors to dominate the rebar market in Puerto Rico, reduce supply, and inflate prices for rebar to supracompetitive levels.

46.    Aceros is 50% owned by ThyssenKrupp AG. Aponte, at all relevant times was the Vice-President and Interim President of Aceros. Goertz and Gendruschke were directors at Aceros.

47.    CBM is 100% owned by ThyssenKrupp Materials Trading GmbH. At all relevant times Sola-Colon was the President of CBM and CB. Goertz and Gendruschke were directors at CBM.

48.    ThyssenKrupp Materials Trading GmbH and ThyssenKrupp Materials N.A., Inc. both employ Goertz and Gendruschke as executives. ThyssenKrupp Materials Trading GmbH and ThyssenKrupp Materials N.A., Inc. are also both subsidiaries of ThyssenKrupp AG.

49.    Collectively, the ThyssenKrupp Defendants are dominant players in the global steel market and used this power to enforce and sustain the price-fixing conspiracy across their Puerto Rican subsidiaries.

50.    The ThyssenKrupp Defendants have unparalleled access to resources, technology, and global distribution networks, enabling them to control the Puerto Rican market.

51.    From 2015 to 2022, ThyssenKrupp directed and enforced the price-fixing agreements through Aceros and CBM who conspired with SSS to fix prices for Rebar in Puerto Rico and elsewhere.

52.    The ThyssenKrupp Defendants' market power and influence allowed them to manipulate the availability of Rebar in Puerto Rico. For example, in 2021, ThyssenKrupp orchestrated a reduction in steel shipments to Puerto Rico, creating an artificial scarcity that

justified further price increases.

53.     ThyssenKrupp has the capacity to control a significant portion of the global steel supply. This has allowed ThyssenKrupp to exercise substantial control over regional markets, including Puerto Rico, where it has imposed anti-competitive practices that have harmed the local economy and consumers.

54.     Thyssenkrupp has a history of using its dominance as one of the top steel producers in the world and, through its subsidiaries, engaging in anticompetitive practices.[1]

55.     For at least eight years, from 2015 to 2022, Defendants exploited their dominant market share and acted as a cartel to: (1) fix the prices of rebar sold in Puerto Rico and elsewhere, (2) reduce the output of rebar sold in Puerto Rico and elsewhere; and (3) allocate customers and market share of rebar.

56.     Defendants carried out the conspiracy through secretive communications including phone calls, in-person meetings, and messages wherein Defendants orchestrated their horizontal conspiracy.

57.     In these communications, Defendants dubbed themselves "La Cosa Nostra" of the steel industry in Puerto Rico and coordinated on rebar prices, price increases, and reducing output of rebar.

58.     During the Class Period, Defendants exchanged numerous communications,

---

[1] ThyssenKrupp has been investigated by the European Commission multiple times for its anticompetitive practices. For example, in 2007, the European Commission fined ThyssenKrupp over €479 million for price-fixing in the elevator and escalator market. *See* Press Release, European Commission, Commission fines members of lifts and escalators cartels over €990 million, available at https://ec.europa.eu/commission/presscorner/detail/en/ip_07_209.  More recently, in 2019, the European Commission blocked the proposed joint venture of ThyssenKrupp and Tata Steel over concerns that it would reduce competition in the European steel market. *See* Press Release, European Commission, Mergers: Commission prohibits proposed merger between Tata Steel and ThyssenKrupp, available at https://ec.europa.eu/commission/presscorner/detail/en/ip_19_2948.

and/or had meetings, in furtherance of the conspiracy.

59.    Below are excerpts of several communications among co-conspirators regarding the conspiracy:[2]

    a.  On or about August 20, 2015:
Aponte: what price do I put [rebar]?

    Sola-Colon: 25.50?

    b.  On or about August 10, 2017:
Sola-Colon: Good afternoon. The prices of rebar have kept rising internationally and the replacement costs are already over $27.50 per quintal. Starting next Monday, we'll start setting firm prices over $28.00 quintal. Please send this message to your clients so your clients can take advantage of the current prices until tomorrow.

    Sola-Colon: Message to the salesmen.

    Aponte: Perfect. Tomorrow, without fail, I will send it out to them so that both of us are on the same page. I just arrived in Mayaguez

    Aponte: Bro, that $28.00 is delivered.

    Sola-Colon: Yes, that is the price we are looking For

    c.  On or about September 13, 2017:
Aponte: Listen, I want to ask you, are we going $28.75? Because the cost today is $27.00 for 1,000.

    Aponte: I want to start laying the groundwork to buy next week.

    Sola-Colon: Most of our orders are between 28.25 and 28.95. Every now and then we toss out a 27.95,

---

[2] The excerpts below are detailed in the criminal proceedings against Aponte and Sola-Colon (See *USA v. Aponte-Tolentino*, Case No. 3:24-cr-00261, ECF No. 3, at 5-8 (D. P.R. 2024); *USA v. Sola-Colon*, Case No. 3:24-cr-00331, ECF No. 2, at 5-8 (D. P.R. 2024)), and are translated from the original Spanish to English.

but today [Fransico García-Alonso[3]] sold a
platform to a client at 26.95.
Aponte: Umm, tomorrow after 12:00, I will raise
without fail to $28.95cwt same as you. We have
sold at $27.95cwt.

d.   On or about December 20, 2017:
Aponte: [a picture of a sticky note with handwritten
prices for Rebar being sold by Aceros and SSS]

Aponte: confirm

Sola-Colon: received
...
Sola-Colon: [to CBM sales employees]: New [Aceros]
rebar prices set by [Aponte] in [Aceros] and [SSS] due
to shortage.

Sola-Colon: This is due to shortage in order to
control demand

Sola-Colon: [to CBM sales employee], we need to react
early tomorrow

e.   On or about June 15, 2018:
Aponte: Bro, at what price should we come out on
Monday?

Aponte: Rebar.

Sola-Colon: I am staying steady at 48.95.

Aponte: Ok, then, we will go there.

Aponte: How much did rebar go up?

Sola-Colon: About .50qq

Sola-Colon: I am looking to earn about 20%.

f.   On or about July 28, 2020:
Aponte: Umm, the Sign asks you if it's right to
raise the price of rebar right now. We will talk

---

[3] Francisco García-Alonso is the former President and owner of SSS and father of Defendant Garcia.
Francisco García-Alonso passed away in 2022, leaving his son, Defendant Garcia, the company.

about the rest on the phone.

Sola-Colon: It is not a bad idea.

Aponte: I will call you soon.
g.  On or about October 27, 2020:
Aponte to Garcia: Look you are hurting the market
to $30.50cwt when you can sell it at $32.50cwt.
The boys want rebar prices to be raised so they
can sell the street.

h.  On or about November 9, 2020:
Aponte: What prices should we be at now?

Sola-Colon: I am at 32.95 per platform and 33.95
base

Aponte: Then fuck it, let's go up there.

Aponte: Profit time.

i.   On or about December 1, 2020:
Aponte: The position is the following: Platform
$33.95, 10 bundles $34.50, Fewer than 10 bundles:
$34.95

Aponte: The question is are we on the same page?

Sola-Colon: Yes, that is what I am doing.

j.   On or about January 15, 2021:
Aponte: [sends screenshot of message from Aponte
to Aceros sales team]

Aponte: $43.50cwt $42.50cwt per pack Starting
now, as always, there are exception if there is
rebar available

Aponte: You received it.

Sola-Colon: Yess

Sola-Colon: I am going to go up little by little

k.  On or about February 15, 2022:
Aponte: Look, this shit is going up. I'm thinking

of going up to $5l.95cwt

Sola-Colon: I agree.

l.   On or about March 3, 2022:
Aponte: IMPORTANT ... I repeat one of the largest
producers of billets in the world is Ukraine. We
are working towards finding other sources of the
supply. Now while the axe comes and goes, we will
restrict it. The price for pick up is $54.00qq.
Delivery is $54.74qq, subject to availability,
credit verification. 10 bundles or fewer is a
safety measure in the face of uncertainty.
Remember that, just as the situation changed from
Friday until today, it could change again
tomorrow. The freight went up 17% since August. We
are dealing with that. The cost has gone up 8%. I
need your protection and solidarity on this
matter.

Garcia: Was that for your sellers?

Garcia: I am not selling more than 15 bundles

Garcia: Right now

Aponte: Exactly.

Garcia: On Monday, I cut to 10.

Aponte: In front of uncertainty we have to be
careful.

Garcia: And I will raise the price like you.

m.  On or about August 8, 2022:
Aponte to Garcia: Do not lower rebar anymore.
Please go with the same if you want and let the
client decide.

60.     These messages, and others exchanged from about January 2015 until December

2022, are direct evidence of Defendants' long running conspiracy to fix supracompetitive prices

for rebar in Puerto Rico and elsewhere.

61.    The illegal conduct, as evidenced above, was orchestrated by high-level executives at ThyssenKrupp, Aceros, CBM, CB and SSS, including Aponte and Sola-Colon, who have both already pled guilty to price fixing charges as detailed below.

62.    On August 8, 2024, Aponte entered into a plea agreement with the United States Department of Justice ("DOJ") admitting to fixing the price of rebar with would-be competitors, impacting more than $100 million in his company's sales.

63.    On August 30, 2024, Sola-Colon entered into a plea agreement with DOJ admitting to price fixing Rebar distributed by his companies.

64.    The aforementioned plea agreements explicitly detail multiple meetings, discussions, and communications where pricing strategies were agreed upon, and coordinated efforts were made to ensure adherence to the agreed-upon inflated prices. This is direct evidence that the Defendants knowingly and intentionally engaged in the conspiracy to fix prices for Rebar in violation of federal and state antitrust laws.

65.    The explicit admissions by Aponte and Sola-Colon in the plea agreements provide clear and convincing evidence of price-fixing and market manipulation by the Defendants. The admissions also show that Defendants concealed their illegal conduct through the use of encrypted messages, coded language, and off-the-books meetings to avoid detection by law enforcement and to maintain the effectiveness of their price- fixing scheme over the course of several years.

**VII.    TOLLING OF THE STATUTES OF LIMITATIONS**

66.    Class member purchases of rebar within four years prior to the filing of this Complaint are not barred by the applicable four-year statutes of limitations; the statutes are not required to be tolled for these claims to be actionable.

67.     Plaintiffs and the Class did not know and could not have known of Defendants' illegal conduct until the Justice Department unsealed the indictments in question on or about August 8, 2024. Before then, Plaintiffs and the Class had no reason to believe that they paid prices for rebar that were affected by Defendants' illegal conduct, and thus had no duty until then to investigate the claims set forth in this Complaint. Defendants' secret price-fixing agreements were inherently self-concealing.

68.     Additionally, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct as stated above.

69.     Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiffs and the Class, the four-year statutes of limitations governing claims under the Sherman Act and the Puerto Rico Antitrust Act were tolled at least until August 8, 2024, pursuant to the injury-discovery rule and the doctrine of fraudulent concealment.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### Violation of the Sherman Act, 15 U.S.C. § 1
#### (By Plaintiffs, Individually and on Behalf of the Class Against All Defendants)

70.     Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as though fully set forth herein.

71.     Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially restraining competition with respect to the price of rebar sold within the United States.

72.     Defendants' activities constitute a per se violation of Section 1 of the Sherman Act.

73.     Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiffs and members of the Class by restraining competition and thereby raising, maintaining

and/or stabilizing the price of rebar at levels above what would have occurred if competition had prevailed.

74.    For this conduct, Plaintiffs and members of the Class are entitled to injunctive relief, and attorneys' fees and costs pursuant to Section 4 of the Clayton Act (15 U.S. Code § 15) and 15 U.S.C. § 26

**SECOND CLAIM FOR RELIEF**
**Violation of the Puerto Rico Antitrust Statute,**
**10 P.R. Laws Ann. §§ 257, *et seq*.**
**(By Plaintiffs Individually and on Behalf of the Puerto Rico Subclass)**

75.    Plaintiffs hereby repeat and incorporate by reference each preceding paragraphs as though fully set forth herein.

76.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of rebar in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

77.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for rebar in the Puerto Rico.

78.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

•    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price rebar at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Puerto Rico Subclass with respect to rebar sold in Puerto Rico;

- allocating products in the United States in furtherance of their agreements; and

- participating in meetings and conversations among themselves in the Puerto Rico and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

79.     The Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products.

80.     The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

81.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of 10 P.R. Laws Ann. §§ 257, *et seq.*

- The Defendants' combination or conspiracy had the following effects: (1) rebar price competition was restrained, suppressed, and eliminated throughout Puerto Rico; (2) rebar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Puerto Rico; (3) Plaintiffs and members of the Puerto Rico Subclass were deprived of free and open competition; and (4) Plaintiffs and members of the Puerto Rico Subclass paid supra- competitive, artificially inflated prices for rebar.

- During the Class Period, the Defendants' illegal conduct had a substantial effect on Puerto Rico commerce.

- As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Puerto Rico Subclass have been injured in their business and property and are threatened with further injury

20

82. By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of 10 P.R. Laws Ann. §§ 257, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 10 P.R. Laws Ann. §§ 257, *et seq*.

**IX.** **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A. This action may proceed as a class action, with Plaintiffs serving as the Class Representatives and their counsel serving as Class Counsel;

B. Defendants have contracted, combined, and conspired in violation of the Sherman Act and the state laws of Puerto Rico;

C. Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

D. Plaintiffs and the Class are entitled to recover treble damages, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount subject to proof at trial;

E. Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate;

F. Plaintiffs and the Class are entitled to equitable relief suitable to remedy Defendants' past and ongoing restraint of trade, including:

    i. A judicial determination declaring the rights of Plaintiffs and the Class, and the corresponding responsibilities of Defendants; and

    ii. Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective

officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations

     iii.  of the law as alleged herein.

G. Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification of this action and their rights to the Class members;

H. Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

I. Plaintiffs and the Class receive such other or further relief as may be just and proper

## X.   <u>JURY TRIAL DEMANDED</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims asserted in this Complaint that are so triable.

**RESPECTFULLY SUBMITTED**.

Dated December 19, 2024

/s/Charles E. Vilaró-Valderrábano
USDC-PR No. 224509
**CANCIO COVAS & SANTIAGO, LLP**
MCS Plaza, Suite A-267
255 Ave. Ponce de León
San Juan, Puerto Rico 00917
Tel:  (787) 756-5333
Fax: (787) 756-5339
cvilaro@ccsllp.com

/s/Thomas H. Burt*
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
(212) 545-4600
burt@whafh.com

/s/Carl V. Malmstrom*
**WOLF HALDENSTEIN ADLER**

**FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, Illinois  60604
Tel: (312) 984-0000
Fax:  (212) 686-0114
malmstrom@whafh.com

/s/Don Bivens*
/s/Teresita Mercado*
**DON BIVENS, PLLC**
15169 N. Scottsdale Road, Suite 205
Scottsdale, Arizona 85254
Tel: (602) 708-1450
don@donbivens.com
teresita@donbivens.com

(*pro hac vice forthcoming)
*Attorneys for Plaintiff*